ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| Conquistador Dorado Joint Venture | ) ASBCA Nos.   60042, 60475, 60620 |
| | )                     60942, 60943, 61111 |
| | )                     61733, 61952 |
| Under Contract No.    N69450-08-C-1267 | ) |

APPEARANCES FOR THE APPELLANT:     Stephen B. Hurlbut, Esq.
                                             John M. Neary, Esq.
                                           Daniel R. Miktus, Esq.
                                           Akerman LLP
                                           Washington, DC

                                           Andrew Schwartz, Esq.
                                         Joseph M. Goldstein, Esq.
                                         Shutts & Bowen, LLP
                                         Ft. Lauderdale, FL

APPEARANCES FOR THE GOVERNMENT:    Craig D. Jensen, Esq.
                                           Navy Chief Trial Attorney
                                         David M. Marquez, Esq.
                                         Trial Attorney

<u>OPINION BY ADMINISTRATIVE JUDGE THRASHER ON THE
GOVERNMENT'S PARTIAL MOTION FOR SUMMARY JUDGEMENT
AND PARTIAL MOTION TO DISMISS</u>

     These appeals arise from a Navy contract awarded to Conquistador Dorado Joint Venture (CDJV or appellant) for the clearing of vegetation and improvement of drainage conditions at Naval Air Station Key West (NAS Key West). The Navy (government) moves for partial summary judgment on Counts I and II of CDJV's Consolidated Complaint[1] (ASBCA Nos. 60042 and 60475) (gov't mot. at 1).

---

[1] On April 10, 2017, the Board docketed CDJV's appeal of the denial of its June 20, 2016 third Claim as ASBCA No. 61111, and consolidated the six pending appeals as ASBCA Nos. 60042, 60475, 60620, 60942, 60943 and 61111. On August 7, 2017, the Board denied CDJV's Motion for Order Requiring Respondent to File the Complaint in ASBCA Nos. 60942 and 60943, thereby requiring CDJV to file a consolidated complaint in all six appeals.

Count I (ASBCA No. 60042) involves CDJV's claim for additional costs from encountering a Differing Site Condition (DSC) during performance, and Count II (ASBCA No. 60475) is CDJV's associated claim for delays resulting from the DSC (cons. compl. at 14-18). Additionally, the Navy moves to dismiss, or in the alternative stay, Count III of the consolidated Complaint (ASBCA No. 60620) alleging the claim submitted in this appeal was an improper undisputed invoice depriving the board of jurisdiction, and that the appeal is duplicative and should be dismissed. (Gov't mot. at 1) For the reasons stated below, we deny the government's motions.

MOTIONS FOR PARTIAL SUMMARY JUDGMENT, ASBCA Nos. 60042 and 60475

STATEMENT OF FACTS (SOF) FOR THE PURPOSES OF THESE MOTIONS

*Solicitation*

1. The Navy issued Solicitation No. N69450-08-R-1267 (solicitation) on March 26, 2008, to bring Naval Air Station Key West (NAS Key West) into compliance with relevant airfield safety requirements (ASBCA Nos. 60042, 60475 R4, tab 1 at GOV0001, 3 at GOV0165). Although the solicitation contemplated a fixed price, design-build contract for the clearing of vegetation and improvement of drainage conditions at NAS Key West, the Navy's partial motion for summary judgment primarily rests upon the vegetation work elements generally described throughout the contract documents as "vegetation conversion" (*see, e.g.*, ASBCA Nos. 60042, 60475 R4, tab 3 at GOV0191). Vegetation conversion includes "vegetation removal, excavation of soft materials and sediment, filling areas to adjust grades, providing special planting soil, planting new vegetation, and maintaining the new vegetation during the establishment/warranty period" (*id.* at ¶ 4.4). The solicitation sets forth a defined area of NAS Key West that is subject to vegetation conversion, and divides that area into 23 units referred to as "Vegetation Conversion Work Areas," also known as "VCAs" (*id.* at ¶ 4.4.1). For each VCA, the solicitation specifies one or more "Treatment Types" that describes the work to be performed in that VCA (ASBCA Nos. 60042, 60475 R4, tab 3 at GOV0193, 0195).

*Geotechnical Survey*

2. The solicitation provided the offerors with a topographic survey prepared in June 2007, but required the contractor to perform additional topographical surveys of the project site and obtain additional soil borings, testing, or other geotechnical information necessary to provide a final design; specifically, warning offerors the geotechnical information is "intended for proposal [] and preliminary design only." The solicitation also provided that the contractor "shall perform, at his expense, such subsurface exploration, investigation, testing, and analysis as his Designer of Recorder

2

deems necessary for the design and construction of the project facilities." (ASBCA Nos. 60042, 60475 R4, tab 3 at GOV0213)

*Contract Award*

3. On September 3, 2008, the Navy awarded Conquistador Dorado JV (CDJV) Contract No. N69450-08-C-1267 (the "Contract") for the design and construction of Phase I (CLINs 0001-0010) of the Airfield Vegetation Construction Project at NAS Key West (ASBCA Nos. 60042, 60475 R4, tab 9 at GOV0549-95). CLIN 0001 required that the contractor "[p]rovide the complete design efforts for all project work included in the RFP on and adjacent to Boca Chica Field including field investigations, data collection, preparing design submittals, responding to review comments, and finalizing designs" (*id.* at GOV0551).

4. The contract incorporated Federal Acquisition Regulation (FAR) 52.236-2, DIFFERING SITE CONDITIONS (Apr 1984) (the DSC clause) and FAR 52.243-4, CHANGES (JUN 2007) (*id.* at GOV0578-79).

*CDJV's April 28, 2011, First Request for Equitable Adjustment*

5. On April 28, 2011, CDJV submitted a request for equitable adjustment (First REA) alleging a DSC as a result of encountering conditions in the project area that resulted in an increase in volume of backfill required to complete the project in excess of the geotechnical information provided in the RFP (ASBCA Nos. 60042, 60475 R4, tab 13 at GOV0991). Upon consideration, the Navy determined that it was not necessary to excavate as much material as originally contemplated by the RFP. The RFP called for the complete removal of soft, compressible soils, and placement of backfill. (ASBCA Nos. 60042, 60475 R4, tab 16 at GOV1017) After discussions with CDJV regarding the REA, the Navy decided to revise Part 3 of Subsection 4.4.3 of the Statement of Work-specifically the descriptions of Treatment Types C and D. (*Id.* at GOV1017-1019) Pursuant to the revised treatment types, CDJV would be required to excavate and backfill only as necessary to support the weight of vegetation maintenance equipment (not aircraft as originally required) (*id.* at GOV1019). As a result of the REA, the parties negotiated an equitable adjustment rather than pay the cost of excavating and backfilling the additional volume of material identified by CDJV in the REA.

*CDJV's Revised REA Proposal with New Excavation Specifications*

6. By email on May 23, 2011, Contract Specialist Gloria Colon forwarded the Navy's SOW revisions to CDJV directing CDJV to submit a revised REA package based upon the Navy's revisions by May 25, 2011(ASBCA Nos. 60042,

60475 R4, tab 16 at GOV 1017-19). In response, CDJV submitted its revised REA proposal by email dated May 26, 2011 (ASBCA Nos. 60042, 60475 R4, tab 17 at GOV1021-1033). The revised REA proposal specifically included the revised excavation specifications, *i.e.,* the revised descriptions for Treatment Types C and D which the Government had provided CDJV via email on May 23, 2011 (*id.* at GOV1025).

*Modification No. P00010 and Government Final Design*

7. It was not until a year later, on May 3, 2012, that the Navy executed bilateral Modification No. P00010, responding to CDJV's April 28, 2011, REA, incorporating CDJV's revised REA proposal dated May 26, 2011 and increasing the contract amount (ASBCA Nos. 60042, 60475 R4, tab 10 at GOV0719-21). The modification's purpose was stated as:

> 1. This modification is issued to incorporate storwater [sic] repairs and price adjustment for backfill material in accordance with contract N69450-08-C-l 267 terms and conditions, contractor's final revised REA proposal dated 26 May 2011 for backfill material and final revised proposal dated 25 Apr 2011 for storwater [sic] repairs. The contract completion date is extended to 30 Sep 2014.
>
> 2. 'Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full for both time and money and for any and all costs, impact effect, and for delays and disruptions arising out of, or incidental to, the work as herein revised'. [sic]
>
> 3. All other terms and conditions remain unchanged.

(*Id.* at GOV0721)

8. CDJV submitted its Final Design Drawings dated May 10, 2012 (ASBCA Nos. 60042, 60475 R4, tab 19). On July 5, 2012, the Navy issued Administrative Modification No. A00005, accepting CDJV's final design, authorizing CDJV to commence construction activities in accordance with the final design, increased the contract price and extended the contract completion date to September 30, 2013 for Phase I of the project (ASBCA Nos. 60042, 60475 R4, tab 10 at GOV0739-44).

*CDJV's September 11, 2013 Second REA, Adjustment and Subsequent June 11, 2014 Claims*

9.  CDJV submitted an REA on June 10, 2013 but the Navy returned it without action as incomplete (ASBCA Nos. 60042, 60475 R4, tabs 21-22).  Thereafter, during a meeting on June 13, 2013 between the Contracting officer (CO), Ms. Jeanette Sweeting, and Mr. Fernando Neris, CDJV's President[2] the CO informed Mr. Neris that the REA could not be considered because it was not a proper notification to the CO of a DSC pursuant to FAR clause 52.236-2 and that an REA could not be considered due to the cost limitation for the project.  Again later, during another meeting on June 20, 2013, the CO again directed Mr. Neris, not to incur any further expenses because the contract had reached its maximum cost limit and:

> Additionally, she stated that all the discussions currently being held are discussions that the Contracting Officer and CDJV should have been having prior to any additional work being performed (pursuant to the Differing Site Conditions clause) [] so that the Government could have reviewed/evaluated the situation and provided proper direction to the contractor.  Mr. Neris stated that they did do this via emails with revised drawings directly to LTJG Wyszynski, who obtained approval from Jose Deliz from NAVFAC Jax.  Mr. Neris stated he would provide all email documentation to the FEAD office.  Mrs. Sweeting stated that all deviations to the final design drawings that have been approved by the Government [must be captured by formal contract modification].

(Gov't reply br. at app'x 013)

10.  Later, on September 11, 2013, CDJV submitted a revised REA (second REA) seeking $8,556,409.00 for additional work required to complete work on Phase I of the project (ASBCA Nos. 60042, 60475 R4, tab 38 at GOV1217, 1221). Specifically, CDJV requested:

> an [e]quitable [a]djustment for the Change in Site conditions regarding the additional vegetation conversion areas that have been required to be converted via Treatment Type C & D in order to complete Phase I of the above-referenced project.  These deviations from the

_____

[2] President of Dorado Services, Inc., which is one of the members of Conquistador Dorado Joint Venture (CDN).

originally proposed design are the result of limited and inaccurate information provided in the RFP for vegetation conversion areas, specifically the data presented in Part 6, Attachment A-Performance Drawings, attachment A.2-Vegitation Conversion Plans.

CDJV would like to clarify that the first REA (dated April 28, 2011) was for additional volume of excavation require due to the limited geotechnical information for the areas that were identified to be excavated, this REA is for additional areas (30.03 Acres) of Treatment Type C/D that were not identified in RFP, Part 6, Attachment A-Performance Drawings, Attachment A-2-Vegitation Conversion Plans.

(*Id.* at GOV1217)  The government denied CDJV's September 11, 2013 REA on March 25, 2014 (ASBCA Nos. 60042, 60475 R4, tab 44).

*CDJV's Claim:  ASBCA No. 60042*

11.  On June 11, 2014, CDJV submitted a certified claim seeking $12,256,852 (ASBCA Nos. 60042, 60475 R4, tab 45).  The certified claim alleged that the Navy agreed to a revised basis of design but "often directed CDJV to excavate to the original design, causing the actual quantity of fill to increase above the amounts included in CDJV's amended REA from May 2011, which has now lead to this Certified Claim for the additional work under Phase I" (*id.* at GOV1356).  On April 6, 2015, the CO issued a Final Decision (COFD) denying CDJV's June 11, 2014 claim in the amount of $12,256,852 (ASBCA Nos. 60042, 60475 R4, tab 49).  CDJV appealed the COFD on June 25, 2014, and the appeal was docketed as ASBCA No. 60042.

*Testimony of Mr. Neris*

12.  Mr. Neris testified by sworn declaration that he repeatedly was in discussions with the CO, Ms. Sweeting, where he informed the CO that CDJV was being required to work in additional treatment areas beyond the scope of the final design drawings but Ms. Sweeting and Mr. Vermillion, the Airfield Manager, nevertheless directed CDJV to perform in these areas.  (App. opp'n, ex. 1 at ¶ 20)  In fact, he later understood from Ms. Sweeting's direction, which was later confirmed on several occasions, that CDJV would have to do the same in all of the other treatment areas and that after these conversations:

6

> Ms. Sweeting repeatedly stated to me that the Navy would either obtain additional Contract funding for the Project, or that she would descope Phase II of the Project as needed to 'catch up' *CDN* on payments for the additional Phase I work. Ms. Sweeting never directed *CDN* to stop performing this extra work in the additional VCA areas, or that the Navy personnel at the VCA walkthroughs did not have the authority to approve the working set drawings.

(*Id.* at ¶ 23)

13. Mr. Neris also testified the additional work ordered by the Navy resulted in CDJV performing a much greater quantity of work, including additional excavation, backfill and planting. He specifically noted that this additional work was not the same work reflected in Modification No. P00010, which was to compensate CDJV for increased depth of material as well as increased backfill. (*Id.* at ¶ 24)

14. Additionally, Mr. Neris testified that he "had numerous in-person conversations during QC Meetings and other meetings with CO Sweeting, where Navy Project Management & Engineering Head Gary Neal was frequently present, about the Navy personnel repeatedly directing [*CDJV*] to excavate to caprock, which was contrary to the Project's revised Basis of Design ('Revised BOD')" (*id.* at ¶ 26). Although CO Sweeting was present during these meetings, Mr. Neris stated that,

> Ms. Sweeting never directed *CDN* to ignore the Navy personnel giving [the] directives or to cease the extra work, nor did Ms. Sweeting ever inform *CDN* that these Navy personnel lacked the authority to direct CDN's work on the Project. Instead, Ms. Sweeting expressly approved of the additional work and costs, always informing *CDN* that she would either provide additional contract funds to compensate *CDN,* or that she would descope the Phase II work as needed to free up Contract funds to pay *CDN* for the additional Phase I work.

(*Id.*)

15. Mr. Neris testified in his Second Supplemental Declaration that he and CO Sweeting, had at least five conversations between December 2012 and January 2013 about the DSC in the VCAs regarding the growing quantities of work and backfill material. He also testified that:

> During some of these meetings, Ms. Sweeting and I
> reviewed the Working Set Drawings prepared by CDJV
> based on the actual conditions discovered in the VCAs once
> VCA conversion work began. Ms. Sweeting and I
> discussed arrangements to compensate CDJV for the
> additional quantities of work performed. Although
> Ms. Sweeting did [not] specifically commit to the
> arrangements we discussed at the time, she assured me that
> the Navy would issue some form of contract modification to
> address the compensation issue created by the differing
> site conditions and changes.

(App. sur-reply, ex. A ¶ 3)

*Government Submittals*

16. The Navy responded to Mr. Neris' testimony by submitting 7 QA/QC Coordination Meeting Minutes from May 23 through July 12, 2013. These meetings were held on a weekly basis between Navy and CDJV representatives to discuss the status of the project, including any issues between the parties. CO Sweeting, and Mr. Neris were present at each of the seven meetings. (Gov't reply br., app'x at GOV APP 001-016) Only three of the meetings directly referenced a DSC or REA (*id.* at GOV APP 008, 009-010, 013). During the June 13, 2013 meeting CO Sweeting suggested that CDJV should not incur any additional expense until the REA was addressed and a resolution accomplished. Additionally, CO Sweeting stated that, "the airfield had reached its threshold for facility maintenance and that no more funds could be added to this facility even if the CO had []additional funds or even as a separate contract." (Gov't reply br., app'x at GOV APP 008) Then, during the meeting the following week, June 20, 2013, the meeting records indicate the CO verbally issued a stop work order and repeated her warning about funding, stating: "that CDJV is NOT to incur any additional expense on this contract[.] This contract has reached its maximum cost limitation and additional funds cannot be added to this contract or issued under a separate contract, even if the Base CO had additional funds available." (*Id.* at GOV APP 010)

17. During a later meeting, on June 27, 2020, the meeting notes indicate there was discussion about the basis of CDJV's second REA including why the area of required conversion expanded. The meeting minutes record that:

> [Ms.] Sweeting tasked CDJV with generating information
> on [h]ow or why these areas had expanded. Additionally,
> she stated that all the discussions currently being held are
> discussions that the Contracting Officer and CDJV should

8

have been having prior to any additional work being [performed] (pursuant to the Differing Site Conditions clause)[] so that the Governmnt[sic] could have reviewed/evaluated the situation and provided proper direction to the contractor. Mr. Neris stated that they did do this via emails with revised drawings directly to LTJG Wyszynski, who obtained approval from Jose Deliz from NAVFAC Jax. Mr. Neris stated he would provide all email documentation to the FEAD office. Mrs. Sweeting stated that all deviations to the final deisgn [sic] drawings that have been approved by the Government [must be captured] by formal contract [modification].

(Gov't reply br., app'x at GOV APP 013)

*CDJV Supplemental Claim*

17. On October 28, 2015, CDJV submitted to the CO what it referred to as a "supplement" to its June 11, 2014 Certified Claim, seeking $542,360 for alleged Government delays (91 days) to CDJV's work associated with the government's alleged actions with respect to CDJV's initial claim (ASBCA Nos. 60042, 60475 R4, tab 50). The CO did not issue a timely final decision on this supplemental claim. Thereafter, CDJV considered it a deemed denial, and appealed its claim on February 26, 2016, which was docketed as ASBCA No. 60475.

<u>DECISION</u>

*Standard of Review*

Summary Judgment is appropriate only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S, 317, 322-23 (1986). The party seeking summary judgment has the burden of demonstrating both elements. *Dongbuk R&U Engineering Co., Ltd.*, ASBCA No. 58300, 13 BCA ¶ 35,389 at 173,637. A material fact is one that may affect the outcome of the decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). There is a "genuine" dispute as to such fact if "the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Id.* at 248. "We do not resolve factual disputes, but determine whether there is a genuine issue of material fact." *BYA International, LLC*, ASBCA No. 57608, 13 BCA ¶ 35,196 at 172,696. Additionally, we draw all justifiable inferences in favor of the nonmoving party. *CI 2, Inc.*, ASBCA Nos. 56257, 56337, 11-2 BCA ¶ 34,823 at 171,353.

9

*Partial Motion for Summary Judgment on Consolidated Complaint, Count I, ASBCA No. 60042*

*Parties' Contentions*

The government asserts it is entitled to a partial summary judgment as to Count I of appellant's consolidated complaint. Count I of appellant's complaint avers that, as a result of its first DSC REA, appellant and the government came to an agreement to revise the project's basis of design based upon reduced requirements (consolidated comp. ¶ 69; SOF ¶ 5). The government issued Modification No. P00010 based upon appellant's first REA but appellant avers it did not expressly incorporate the revised basis of design agreed to by the parties (*id.* ¶ 70; SOF ¶ 7). Despite the revised agreement and repeated assurances that appellant should perform work in accordance with the revised basis of design, appellant avers the government required appellant to perform to the original basis of design (*id.* ¶ 71; SOF ¶ 11). As a result of performing as directed by the government to the original basis of design, appellant avers it encountered a DSC that differed from the DSC that formed the basis of its first REA (*id.* ¶ 72; SOF ¶ 11).

The government requests we grant a partial summary judgement on Count I of appellant's consolidated complaint based upon four basic arguments.

***1. The Government Asserts there is No Evidence to Support the Government Directed Appellant to Perform Work Beyond the Revised Scope of Work Agreed to Under Modification No. P00010***

The government's motion asserts that CDJV cannot establish that any government representative with contract authority directed CDJV to perform extra work beyond the limits of the approved revised design (gov't mot. at 38-47). Appellant responds by producing a sworn declaration by Mr. Neris that directly contradicts the government's argument, stating he was present when the CO Sweeting, either directly or was present when other government personnel, directed appellant to perform work beyond the final design drawings (SOF ¶¶ 12, 14).

The government responds in its reply brief that we should not rely upon the statements in Mr. Neris' declaration because such statements are self-serving, appellant has not provided any contemporaneous documents to support such statements, such statements are directly at odds with contemporaneous documents, such as QA/QC Coordination Meeting Minutes, attached to the government's reply as Government appendix 1-7, and they do not allege any direction was provided in writing (gov't reply br. at 12-17).

Under our Board Rules, we look to Rule 56 of the Federal Rules of Civil Procedure (FRCP) for guidance. *Rules of the Armed Services Board of Contract*

10

*Appeals*, Rule 7(c)(2), (July 21, 2014). FRCP 56(c)(4) specifically addresses the standards an affidavit or declaration must meet, stating: "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Mr. Neris' declarations meet the criteria under Rule 56 to oppose a motion for summary judgment. His declarations are made on personal knowledge, set out facts that would be admissible in evidence, and show that declarant is competent to testify on the matters stated, in accordance with FRCP, Rule 56(c)(4).

The government's arguments that Mr. Neris' statements are self-serving, the fact that there may be contradictory evidence in the record or that there may not be any written record of any government direction, are arguments that we consider as we weigh this evidence and make a determination of Mr. Neris' credibility as a fact witness. Regarding the characterization of Mr. Neris' affidavit as self-serving, we would point out that most testimonial declarations by their nature are self-serving. However, we take the government's point perhaps to be that it is convenient that two key witnesses, CO Sweeting,[3] and the airfield manager, Mr. Vermillian,[4] are unavailable to testify as witnesses. Additionally, we have reviewed the evidence presented by the government in response to Mr. Neris' testimony. Drawing all justifiable inferences in favor of the nonmoving party, the government's evidence arguably indicates that CO Sweeting and Mr. Neris communicated on a regular basis concerning the progress of work and performance issues and CO Sweeting issued verbal orders on a regular basis (SOF ¶ 16). We conclude this evidence, in its totality, does not directly contradict Mr. Neris' testimony such that it entitles the government to a summary judgment as a matter of law. These are all issues that will be appropriate for determination on the merits, but we do not resolve controversies, weigh evidence, or make determinations of credibility in deciding a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 255. Consequently, we conclude there is a genuine issue of material fact as to whether the government directed CDJV to perform work beyond the scope of the revised design agreed to in Modification No. P00010 that precludes granting summary judgment on this issue.

---

[3] CO Sweeting was diagnosed with a brain tumor and retired for medical reasons during contract performance. The Navy informed appellant in a response to an interrogatory that she is not available as a witness in this appeal. (App. opp'n, ex. 3 at 3 ¶ a)

[4] The Navy informed CDJV that the Airfield Manager Mr. David Vermillion, has passed away (app. sur reply at [10] n. 10).

11

## 2. *Whether CDJV provided the Government Notice of Claimed Differing Site Conditions and, if not, Whether the Government was Prejudiced*

The government's motion asserts CDJV's differing site condition claim fails because CDJV did not provide the government with the required notice of the claim prior to performing the work as required by the DSC clause of the contract, resulting in prejudice to the government (gov't mot. at 49-51). CDJV responded with Mr. Neris' testimony that he and the CO had several conversations between December 2012 and January 2013 regarding the DSC encountered and discussed arrangements to compensate CDJV for the DSC (SOF ¶ 15). The evidence proffered by the government in response to Mr. Neris' testimony does not directly contradict his testimony. In fact, drawing all justifiable inferences in favor of the nonmoving party, it indicates Mr. Neris and CO Sweeting regularly communicated about issues impacting the project, specifically including the claim before us. (SOF ¶¶ 16-17) Consequently, we conclude there is a genuine issue of material fact whether CDJV provided notice of differing site conditions prior to performing the work, and whether the CO verbally ratified the orders of other government officials that ordered the work, that precludes granting partial summary judgment on this issue. *CI 2, Inc.*, 11-2 BCA ¶ 34,823 at 171,353. [5]

## 3. *Contractor Design Responsibility under a Design–Build Contract*

Initially the government argued this was a design build contract, and as such, CDJV was responsible for the design of the project, not the government, and has only itself to blame for any work it was required to perform outside the parameters of its own design (gov't mot. at 37-38). The logic of this argument is that the DSC Clause is applied more restrictively in a design-build contract; that the risk of inaccurate subsurface data is transferred to the design-build contractor by the fact that it is a design-build project. This argument has been repeatedly rejected by this forum and the Federal Circuit. *John C. Grimberg Co., Inc*., ASBCA No. 58791 *et al.*, 18-1 BCA ¶ 37,191 at 181,033 (citing *Metcalf Construction Co., Inc. v. United States*, 742 F.3d 984, 995-96 (Fed. Cir. 2014)). Consequently, the design risk is transferred to appellant but not the risk of encountering DSCs. Accordingly, the government's argument must fail.

## 4. *Claims are Barred under Modification No. P00010 by Accord and Satisfaction Provision*

Additionally, the government argues that to the extent CDJV's differing site condition claim is based upon the government's failure to comply with the revised basis of design in Modification No. P00010, CDJV's claim is barred by the accord and

---

[5] Given the decision on the notice will await decision on the merits, we need not address the prejudice issue here.

12

satisfaction agreed to between the parties in bilateral Modification No. P00010 (gov't mot. at 52-53). The government later explained that it is not arguing P00010 bars a claim for additional work beyond the revised basis of design as incorporated into P00010, but that it bars a Type I DSC (gov't reply br. at 28-29; gov't sur-sur reply br. at 18-20). Appellant not only avers that the government ordered it to work beyond the revised basis of design but also directed it to excavate to the original design where it encountered a DSC (SOF ¶ 11; consolidated complaint ¶ 71). Determining whether P00010 bars appellant's claim for a Type I DSC will require a determination of where the alleged DSC occurred in relation to the original basis of design, and that will require testimony to explain and clarify interpretations of drawings and specifications. Consequently, we conclude the record on this issue needs to be further developed and summary judgment is not appropriate in this instance. *Skanska US Building, Inc.*, ASBCA No. 56339, 10-1 BCA ¶ 34,392 at 169,834 (summary judgment denied, hearing needed to explain and clarify interpretations of drawings and specifications).

*Partial Motion for Summary Judgment, Consolidated Complaint, Count II, ASBCA No. 60475*

Count II of appellant's consolidated complaint avers that if it had been able to perform to the revised basis of design instead of the original design as ordered by the government, it would have finished the project by July 1, 2013, which was 91 days prior to the required Phase I completion date of September 30, 2013, causing appellant to incur additional unanticipated sums for additional employees, equipment, hours, and costs (consolidated compl. ¶¶ 79, 80). As a result, appellant avers it was delayed in completing Phase I by 91 calendar days until September 30, 2013 (*id.* ¶ 81). Additionally, CDJV avers that throughout the Project, CDJV experienced several excusable delays caused solely by the Navy including, but not limited to, CDJV's and its subcontractors' inability to enter the Navy base in a timely manner, and CDJV's inability to excavate areas on schedule due to security requirements not present in the RFP (*id.* ¶ 83).[6]

The government's sole basis that we grant partial summary judgment as to Count II, is that appellant has not met its initial burden of proving the government caused such alleged delays (gov't mot. at 53-54). For the most part, Count II is dependent upon our decision on the merits regarding Count I, given we have denied the government's partial motion regarding Count I, we deny the government's partial motion on Count II as well.

---

[6] These delays seem independent from the Count I claim and are not addressed by the government's partial motion for summary judgment. Therefore, we need not address them here.

*GOVERNMENT MOTION TO DISMISS FOR LACK OF JURISDICTION, ASBCA No. 60620*

The Navy filed a motion to dismiss, or in the alternative stay, Count III of the consolidated complaint relating to ASBCA No. 60620. The Navy alleges that the underlying claim submitted by CDJV was an improper undisputed invoice, depriving the Board of jurisdiction over the matter. The Navy also alleges that the appeal was duplicative, and should be dismissed.

CDJV opposes the motion, stating that the claim was made from the denial of the invoice, which is a proper claim. CDJV also differentiated ASBCA No. 60620 from the other appeals the Navy alleges it mirrors. We deny the motion.

STATEMENT OF FACTS FOR THE PURPOSES OF THIS MOTION

1. On September 3, 2008, the Navy (Navy or government) awarded design and construction No. N69450-08-C-1267 to CDJV (ASBCA No. 60045, 60475 R4, tab 9 at GOV0549-95).

2. The contract incorporates, by reference, FAR 52.232-5, PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (SEPT 2002) and FAR 52.233-1, Alt I DISPUTES (Jul 2002) – Alternate I (*id.* at GOV0578). FAR 52.232-5 requires progress payments to be certified, and FAR 52.233-1(c) provides

> [a] voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under [the CDA]. The submission may be converted to a claim under [the CDA], by complying with the submission and certification requirements of this clause, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

3. The contract also incorporated Defense Federal Acquisition Regulations Supplement (DFARS) 252.232-7003, ELECTRIC SUBMISSION OF PAYMENT REQUESTS AND RECEIVING REPORTS (MAR 2008) and Naval Facilities Acquisition Standards (NFAS) 5252.232-9301, INVOICING PROCEDURES ELECTRONIC (FEB 2009), by bilateral Modification No. A00001. The inclusion required appellant to submit its invoices electronically in the DoD Wide Area Workflow (WAWF) system. (ASBCA No. 60620 R4, tab 4)

4. CDJV alleges, and the Navy does not dispute, that it was standard procedure for CDJV to submit its invoices to the Navy for review prior to uploading the invoice

14

into the WAWF system for payment (app. opp'n at 1; compl. ¶ 11; *see generally* gov't reply).

6. In an invoice dated December 19, 2014, CDJV requested payment of $999,060.03 from the government (ASBCA No. 60620 R4, tab 1, attachment A at GOV0007-0028).

6. Between January and February 2015, the Navy and CDJV exchanged emails regarding the status of payment (ASBCA No. 60620 R4, tab 1, attachments B and C at GOV0030-35). Initially, the contract specialist indicated the government needed to "look at the numbers to see where we are" and she would "get back with you early next week" (*id.* at GOV 30). When CDJV inquired again, the contract specialist stated that per FAR 52.232-5, the Navy could retain withheld payments for protection of the government. Specifically, the contract specialist said the retention of payments was due to the amount of work remaining. As such, she would not authorize any payments to CDJV. (*Id.* at GOV0033)

7. On February 18, 2016, CDJV submitted a certified claim to the contracting officer related to a December 2014 invoice that the Navy stated it would not pay (ASBCA No. 60620 R4, tab 1 at GOV0001-0004).

8. After CDJV did not receive a contracting officer's final decision for their claim, it appealed the deemed denial to the Board. The Board docketed the notice of appeal as ASBCA No. 60620 on June 13, 2016.

9. After ASBCA No. 60620 was docketed, the Navy filed an initial motion to dismiss, arguing that the claim was improper. In the alternative, the Navy requested the case be stayed pending the issuance of a COFD for a related claim that was submitted on June 20, 2016. (Gov't mot. dtd. August 29, 2016) The case was stayed (Board Order dtd. November 29, 2016). On September 29, 2016, the Navy issued a COFD, denying the June 20, 2016 invoice. The appeal remained stayed until CDJV filed another appeal from the COFD related to the June claim, and those appeals were docketed as ASBCA Nos. 60942 and 60943, respectively.

## DECISION

Appellant bears the burden of proving the Board's jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exchange Service*, 846 F.2d 746, 748 (Fed. Cir. 1988); *United Healthcare Partners, Inc.*, ASBCA No. 58123, 13 BCA ¶ 35,277 at 173,156. Pursuant to the CDA, "[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision." 41 U.S.C. § 7103(a)(1). As such, appellant must prove that it submitted a claim for payment of the December 2014 invoice to the

15

contracting officer to establish that the Board has jurisdiction. *Id.*; *United Healthcare Partners*, 13 BCA ¶ 35,277 at 173,156-57.

The government relies on *Panjshir Kandahur Constr. Co.*, ASBCA No. 60173, 16-1 BCA ¶ 36,439, to make the argument that the claim submitted by CDJV is insufficient. However, *Panjshir* is distinguishable from the instant appeal. In *Panjshir*, the government terminated the contract for convenience. *Id.* at 177,604. Prior to the termination, the appellant submitted Invoice 004, which was approved by the government and paid in full. *Id.* at 177,604-05. Over three years later, appellant filed a notice of appeal with the Board, requesting what it alleged was a remaining balance due from the government and attaching Invoice 005 and a DD Form 250 which discussed the invoice. *Id.* at 177,605. The government moved to dismiss, and the Board granted the motion, stating the appellant provided no documentation to show that it submitted a claim for the payment of the invoice to the contracting officer. *Id.* The Board went on, stating:

> Although in certain circumstances an invoice, once submitted to the contracting officer for payment, may be converted into a claim, *see* FAR 2.101, the record is devoid of any evidence that the Army ever received a copy of Invoice No. 005 prior to PKCC's filing of this appeal, much less a claim for payment of the invoice that comports with the requirements of FAR 2.101. Although PKCC's 22 February 2016 email to the Board alleges that it provided 'the final pay package to the camp eggers financial office' (SOF ¶ 6), this allegation, taken as true, supports a finding that PKCC submitted a routine request for payment and not a claim. See FAR 2.101 ("A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim."). PKCC has therefore failed to meet its burden of establishing the Board's jurisdiction.

*Id.* at 177,605-06.

Unlike *Panjshir*, appellant did not appeal the denial of the invoice. Instead, appellant submitted a claim completely separate from the invoice (SOF ¶ 6). The claim was properly certified and submitted to the contracting officer after the government refused to pay the invoiced amount (SOF ¶ 6). The contracting officer did not issue a decision on the claim, and CDJV properly filed an appeal from the deemed denial of its claim to the Board. Accordingly, the Board has jurisdiction over the merits of the appeal based on the claim submitted to and the deemed denial by the contracting officer.

16

The government also argues that the invoice was not properly submitted until after ASBCA No. 60620 was filed. Even if this were the case, it would not make the matter ripe for dismissal under the theory that the Board lacks jurisdiction. This issue goes to the merits of the claim, not the Board's jurisdiction, which turns on whether or not a properly certified claim was submitted to the contracting officer. The government is making substantive, merits arguments and attempting to label them as jurisdictional issues.

Next, the government alleges that this claim is duplicative and should be dismissed. Oddly enough, the government does not state which claim it believes ASBCA No. 60620 is duplicative of, only that the monetary amount of ASBCA No. 60620 is included in subsequent appeals. The government relies on *Thompson Aerospace, Inc.*, ASBCA Nos. 51548, 51904, 99-1 BCA ¶ 30,232 to make its point.

Again, the instant appeal is distinguishable from *Thompson*. In *Thompson*, the appellant submitted a claim to the contracting officer, which the contracting officer not only denied, but also asserted a claim against the appellant (COFD I). *Id.* at 149,568. The government subsequently issued multiple amended contracting officer's final decisions (COFDs), the first increasing the government claim against the appellant (COFD II) and the second including additional standardized language about government debt collection efforts (COFD III). *Id.* at 149,568-69. After receiving COFD II, the appellant filed a notice of appeal, indicating it was appealing COFD I and COFD II. *Id.* at 149,568. The Board refused to accept the notice of appeal for filing, as postage was due on it. *Id.* The notice of appeal was returned to the appellant, unopened. *Id.* About one week later, the appellant resubmitted its notice of appeal, and the Board docketed two separate appeal numbers, one for the denial of the appellant's claim and one for the government's claim. *Id.* After the appellant received COFD III, it filed another notice of appeal, and the Board docketed two additional appeals, one for the denial of appellant's claim and one for the government claim. *Id.*

The government filed a motion to dismiss based on the timeliness of the appeals. *Id.* While the motion was denied, upon review of the appeals, the Board decided to dismiss one of the appellant's appeals as duplicative because both appeals were taken from the same denial of appellant's claim. *Id.* at 149,570. The Board found that the second appeal that was docketed for the denial of the appellant's claim was identical to, and therefore duplicative of, the first appeal docketed for the denial of appellant's claim. *Id.*

Here, there are two separate and distinct claims – one for the denial of the December 2014 invoice, and one for the denial of the March 2016 invoice. Although they may rely on similar underlying facts, there are two separate claims that have been appealed. As such, the claims are not duplicative as described in *Thomas Aero, Inc.*,

17

and there is no basis for dismissal. Appellant has established a prima facie case of jurisdiction over ASBCA No. 60620. The government's motion is denied.

## CONCLUSION

For the reasons stated herein, the government's motions for partial summary judgment in ASBCA Nos. 60042 and 60475 and motion to dismiss for lack of jurisdiction, or in the alternative to stay, in ASBCA No. 60620 are denied.

Dated: June 12, 2020

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 60042, 60475, 60620, 60942, 60943, 61111, 61733, 61952, Appeals of Conquistador Dorado Joint Venture, rendered in conformance with the Board's Charter.

Dated: June 12, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals